UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v.-

EASY RENT SYSTEMS, INC. and
JEFFREY HURANT,

                  Defendants.

**16-cr-45 (MKB)**

**SENTENCING MEMORANDUM OF
JEFFREY HURANT AND EASY RENT SYSTEMS, INC.**

Michael Tremonte
Noam Biale
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Fax: 212.202.4156
E-mail: mtremonte@shertremonte.com

*Attorneys for Jeffrey Hurant
and Easy Rent Systems, Inc.*

# PRELIMINARY STATEMENT

Jeffrey Hurant and Easy Rent Systems, Inc., by their undersigned counsel, respectfully submit this memorandum in connection with sentencing, which is scheduled for May 5, 2017. Both Mr. Hurant and Easy Rent Systems pled guilty to promotion of prostitution, in violation of 18 U.S.C. § 1952(a)(3)(A), and Easy Rent Systems pled guilty to money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Mr. Hurant pled guilty pursuant to a plea agreement with the government, which calculated Mr. Hurant's Sentencing Guidelines range at 15 to 21 months. For the reasons discussed below, we respectfully submit that a non-incarceratory sentence for Jeffrey Hurant is sufficient but not greater than necessary to achieve the sentencing purposes set forth in 18 U.S.C. § 3553(a). Because the prosecution has put Easy Rent Systems out of business, we respectfully submit that no further sanction is necessary for the corporate entity.

Mr. Hurant has admitted that his business, Rentboy.com, an online escort advertising platform, operated unlawfully, and he accepts full responsibility. Nevertheless, in fashioning an appropriate sentence, this Court should consider the unique circumstances of Mr. Hurant's life, his career trajectory, and the way in which he managed Rentboy.com. Mr. Hurant's perspective was shaped by, among other things, his experiences growing up gay in New Jersey in the 1970s and ███████████████ in New York City in the 1980s and 1990s. Against this backdrop, Mr. Hurant conceived of Rentboy.com as a commercial venture that promoted, in addition to his own financial interest, an image of positivity and pride in gay sexuality. He sought guidance from lawyers about how to run the business lawfully, though he was at all times well aware, and never denied, that the website facilitated acts of prostitution. Still, he operated Rentboy.com with a special focus on the health and wellbeing of the escorts who advertised on the site. He

invested the company's profits in a variety of services meant to improve their safety and self-determination.

Mr. Hurant operated Rentboy.com openly for nearly twenty years. During that time, Mr. Hurant built a reputation as a leader in the LGBTQ community, a conscientious businessman, and a caring friend to many, including the numerous individuals and organizations who have written letters in his support. Now, Mr. Hurant has taken significant steps to put his life on a different path, devoting his energies to lawful employment, cultivating his religious community, and ███████████████. Given the unique factors surrounding the offense, as well as Mr. Hurant's positive contributions to his community both before and after his arrest, a sentence of imprisonment would not serve the public interest.

## FACTUAL BACKGROUND

### I.  Relevant Life History[1]

Mr. Hurant was born in 1965 in Queens, the son of Leslie and Edythe Hurant. The family later moved to Hackensack, New Jersey. He enjoyed a sheltered and happy childhood, though his adolescence was difficult, as there was little mainstream acceptance of same-sex relationships in the 1970s and still less acceptance and support for gay teenagers.

His adolescence was further complicated by strained relations with his father, which resulted in large part from Mr. Hurant's emerging consciousness that he was gay and from success in business at a young age. At fourteen, he started a business selling cable boxes that could be used to view cable in a second room of a household. Mr. Hurant understood that it was legal in New Jersey to sell cable boxes, but illegal – though technically feasible – to use them

---

[1]     The following information is taken from the PSR, counsel's discussions with Jeffrey Hurant, and letters submitted on Mr. Hurant's behalf, attached hereto as **Exhibit A**.

without notifying the cable company.  Mr. Hurant saw an untapped market, and began selling cable boxes after school from his parents' home, with a disclaimer to his customers that they could not use the boxes to steal cable.  When the local cable company learned about the young teenager's profitable business, they sent a team of private investigators to confront him.  Mr. Hurant called the police and explained that his conduct was lawful.  Ultimately, the New Jersey Legislature specifically proscribed the sale of cable boxes, at which point Mr. Hurant shut down his business.

Mr. Hurant's relationship with his father was tested further when he came out at age sixteen.  Over time, with the aid of group therapy, Mr. Hurant's father came to understand and accept his son, and their bond was repaired and strengthened.  Mr. Hurant's father is now his most committed supporter.

After graduating high school in 1983, Mr. Hurant enrolled at NYU.  As an undergraduate philosophy major, Mr. Hurant enjoyed debating ideas and politics with his friends; but his true talents lay in mathematics, emerging computer technology and business.  Mr. Hurant started a web consulting business in his dorm room, which became commercially viable by the time he graduated.

His senior year, Mr. Hurant moved to the East Village, which seemed to him a paradise for nonconformists, so long as you could stand the noise, street crime, addicts and pushers.  The block he lived on was a popular corridor for streetwalkers – prostitutes who solicited business from passing cars and pedestrians.  These women, many addicted to drugs provided by their ever-present pimps, spent all night on the street, exposed to abuse, harassment and violence.  These experiences left an impression on Mr. Hurant and shaped his later thinking about Rentboy.com.

Mr. Hurant's undergraduate years corresponded with a frightening time for gay men in New York City, who were facing the onslaught of the AIDS epidemic. From the mid-1980s to the mid-1990s, the number of AIDS-related deaths in the United States exploded to nearly fifty thousand. Gay men in New York at this time also faced debilitating stigmatization. As California congressman Henry Waxman explained, "What society judged was not the severity of the disease but the social acceptability of the individuals affected with it." Randy Shilts, *And the Band Played On: Politics, People and the AIDS Epidemic* 143-44 (1987).

Thus, at the very same time that Mr. Hurant found acceptance in the gay community, that community experienced devastating losses. Indeed, Mr. Hurant's boyfriend ███████ ████████ died after six years ████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████

Notwithstanding these hardships, Mr. Hurant continued to grow his computer consulting business. He was an early and successful Internet entrepreneur. At its height, his consulting company, Brave New Consultants, Inc., had thirty-two employees and in the 1990s was earning annual revenue as high as $3 million. After his boyfriend Jorge's death in 1992, Mr. Hurant met James Reyes, a medical resident who went on to become a psychiatrist and the love of Mr. Hurant's life. Mr. Hurant and Mr. Reyes remained together for more than twenty years.

## II.     Founding and Operation of Rentboy.com

By 1996, in addition to his web consulting business, Mr. Hurant had also started a spinoff web hosting business, Brave New Telemedia, and was pursuing other Internet-based

opportunities.  At that time, escort advertising was ubiquitous in the back pages of free weekly publications like the *Village Voice*, in mainstream periodicals like *New York Magazine*, and in the gay press.  Mr. Hurant also had friends from college who earned extra money as escorts.  He had the simple idea to put their ads online, and that is how Rentboy.com started.  Initially, he did not charge for posting the advertisements.  He was well aware – based on discussions with his friends who were escorts but also as a matter of common sense – that the escort ads he posted, which typically featured a racy photo and detailed information about the escort's anatomy, were thinly-veiled proposals of sexual services in exchange for money.  Given the ubiquity of such ads and the fact that they were featured in mainstream magazines and the Yellow Pages, Mr. Hurant concluded that such ads must either be lawful, notwithstanding the obvious allusions to paid sex, or that the chances of prosecution were vanishingly small.

He registered the domain name Rentboy.com.  But before he began operating the website in earnest, Mr. Hurant sought an opinion on the legality of the business.  On or about April 23, 1997, Mr. Hurant received a legal memo (attached hereto as **Exhibit B**), which identified two main areas of legal concern:  anti-prostitution and indecency laws.  The memo referred specifically to the federal Travel Act and the New York state prohibition on promoting prostitution.  The memo observed that, "we all know that thinly disguised ads abound in print, TV and on the Web," citing the *Village Voice* as an example, and that "the speech in the ads is cleverly drawn so as to be protected."  Accordingly, the memo advised Mr. Hurant to draft the ads in the same way.  The lawyer's conclusion was that Rentboy.com cannot advertise escort services "blat[a]ntly as prostitution, but it is likely there will not be a problem" so long as the text of the ads referenced only lawful services, such as companionship and massage.  The

attorney also proposed language for an "Advertiser Agreement" and "User Agreement," to which all advertisers and visitors to the site would have to agree.

With this legal memo in hand, Mr. Hurant began operating Rentboy.com as a free platform, where escorts could post the same ads on the web that they had been posting in print publications. As the site grew, Mr. Hurant began charging a fee for posting. During its first decade, the website focused primarily on gaining visibility and was barely profitable. Although he wanted the business to be commercially viable, Mr. Hurant believed that the website promoted human connection and a sex-positive message and had an important role to play in the gay community.[2]

Over time, Mr. Hurant increasingly focused on issues and opportunities unique to gay male escorts. Online advertising facilitated escorts' control over their work, principally by eliminating streetwalking and enabling the screening of clients via email exchanges. Online advertising also facilitated separation from escort agencies and pimps. The site did initially transact with escort agencies, but those dealings decreased over time, not least of all because

---

[2]     As historical background, it is worth noting a longstanding affinity, recognized by historians, between male, homosexual culture and prostitution, dating back to the 19th Century, when, due to the total absence of socially acceptable locations in which men could meet romantically, a street hook-up culture developed in New York, London, and other major cities. *See generally* George Chauncey, *Gay New York* (1994). Indeed, many of the slang terms for homosexual men initially connoted transactional sex, including "gay," a term derived from "gay cat," a late 19th Century slang term referring to a young man willing to trade sexual favors for money. *See* Jonathan E. Lighter, *A Historical Dictionary of American Slang, Vol. 1* 871 (1994). It is also notable that the criminal offense of prostitution was not interpreted to apply to *male* prostitution until the 1960s, *see People v. Hale*, 8 N.Y.2d 162, 164 (1960), coinciding with the police crackdown on gay street culture that led to the modern gay rights movement. *See* Exhibit A (Letter of Melinda Chateauvert (noting, based on historical study, that men "were almost never arrested for selling sex until the 1970s, notably after the emergence of the gay rights movement").

Rentboy.com undermined the agencies' business model. Ultimately, Rentboy.com became a well-known fixture in the gay community, with floats in the Gay Pride Parade that displayed cheeky slogans like "Money can't buy you love . . . but the rest is negotiable," and popular parties in New York and other cities around the world.

As Rentboy.com grew, so too did its emphasis on uniform policies and procedures. While running Brave New Consultants, Mr. Hurant had engaged a large international law firm, which also advised and provided transactional support to Rentboy.com. Although Mr. Hurant did not engage the firm to opine on the legality of the business *per se*, it advised Rentboy.com on a variety of legal issues over the course of more than a decade (for which the company paid hundreds of thousands of dollars). Its lawyers advised Mr. Hurant directly and interacted with other employees of the company, essentially serving as outside general counsel. It revised Rentboy.com's Terms of Use, which included a warning that reflected the advice contained in the original 1997 memo (a copy of which Mr. Hurant provided to the firm): that escorts could advertise on the site so long as they did not explicitly offer sexual conduct for a fee. Rentboy.com employees periodically sent text from profiles that they were concerned stepped over the line toward soliciting prostitution explicitly, and asked the lawyers' advice about whether or not to ban the advertisers. The firm also weighed in on proposed age verification procedures, whereby Rentboy employees screened photographs of advertisers before posting them to the site and requested identification from anyone who looked to be underage.

Throughout the period that the law firm was advising the company, Mr. Hurant occasionally expressed concern about law enforcement investigations targeting erotic services advertising websites. The law firm confirmed that there were risks to operating Rentboy.com, but never advised Mr. Hurant that the site was illegal. To the contrary, the firm's lawyers

7

proposed fixes and tweaks to the site's Terms of Use, which Mr. Hurant hoped would minimize the chances of a criminal investigation.

Outside legal counsel also handled Rentboy.com's responses to subpoenas and other law enforcement requests. Rentboy.com had a policy of always cooperating with law enforcement. Accordingly, on multiple occasions the company's outside counsel provided law enforcement with records, including transcripts of messaging, IP addresses and credit card information, relating to advertisers. In every instance, outside counsel assured Mr. Hurant that Rentboy.com was not a target of the investigation.

The company maintained a detailed training manual, which included policies on ad content and age verification, as well as content revision guidelines, and ensured that each new employee was well aware of its screening procedures for advertisements. The company's policies were established under the supervision of lawyers, disclosed on the website, and followed. Based on an understanding that adherence to such policies was not only ethical, but a legal requirement, Rentboy.com operated openly and publicly maintained over the course of nearly two decades that it operated within the law by prohibiting explicit offers of sex for money.

Rentboy's popularity grew, in part through highly public events like the "Hookies" Awards, which were presented annually at a show in Manhattan's theater district by celebrities. *See* Exhibit A (Letter of Michael Musto). The website was also the topic of news shows like Rachel Maddow, as well as late-night comedians on the Tonight Show and the Colbert Report. As its notoriety and profitability increased, Mr. Hurant focused more on creating programs that provided support to male escorts.

### III.     Programs for Escort Advertisers

Mr. Hurant's  relationship with the escorts who advertised on Rentboy.com was not only transactional.  Many were his friends and the company's office was a welcoming environment to advertisers.  Time and again, escorts and their clients thanked Mr. Hurant for providing what they viewed as an important service that promoted the safety, self-determination and self-esteem of people participating in a business that is fraught with peril and stigma.  Mr. Hurant was at the center of a large and supportive community, which overwhelmingly believed that Rentboy.com promoted the best interests of the gay male escorts who advertised on, and clients who met them through, the site.

Mr. Hurant invested the company's profits in providing services for the escorts who advertised on the site.  This included investment in education programs, such as the HOOK forum for sharing information about safe sex and harm-reduction strategies.  Rentboy.com ultimately hosted HOOK's web presence, called HOOK Online.  He also developed Rentboy U, which offered classes on safe escorting and safe sex practices, financial management, and even counseling for sex workers who wanted to leave the escorting business.  He established a scholarship fund, "Cash 4 Class," for advertisers who wanted to pursue their education while working as male escorts.  As part of this program, cash prizes were awarded for essays and videos on the topic "Why going to school is part of my dream."  He highlighted advertisers' stories, launching a Youtube channel for Rentboy.com, which featured advertisers discussing the profession and promoting themselves with the hashtag #LoveWhatIDo, explaining how they decided to start escorting, how they managed their own escort businesses, and why they enjoyed

the lifestyle it afforded them.[3]  And Mr. Hurant contributed substantially to public health initiatives battling HIV/AIDS infection rates:  Rentboy.com collaborated with the New York City Department of Health to set up focus groups and provide information to sex workers about HIV and safe sex practices; it provided funding, free ad space, and other resources to CUNY's Center for HIV Educational Studies and Training (CHEST) to promote HIV prevention education; and it assisted that organization with conducting several surveys of male escort sex workers, including the largest such survey, the findings of which have been published in peer-reviewed journals.  *See* Exhibit A (Letters of Chris Beyrer, Christian Grov, and Juline Koken).[4]

In the last year before the arrests in the case and the shuttering of the company, Mr. Hurant hired a Chief Operating Officer who was a well-known advocate for decriminalization of prostitution and harm reduction techniques.  Consequently, Rentboy.com became a significant voice in the political movement for decriminalization.  Until recently, it seemed to be in good company in a movement with significant momentum behind it.  For

---

[3]     Examples of such videos can be found at https://www.youtube.com/watch?v=TdFE-ZW35Ow; https://www.youtube.com/watch?v=6DAc9xNunq0; and https://www.youtube.com/watch?v=8lJXTDAlS5g&index=2&list=PLcc7ugnSgm3py2NFBJDsmCLD-joHujuL9.

[4]     Epidemiological studies have found that decriminalization and de-stigmatization of sex work – as well as the educational efforts undertaken by Rentboy – lead to significant reductions in HIV infection rates.  *See, e.g.*, Baral SD, Friendman MR, Geibel S, Rebe K, Bozhinov B, Diouf D, Sabin K, Holland C, Chan R, Caceres C. *Male sex workers: practices, contexts and vulnerabilities for HIV acquisition and transmission*, The Lancet, July 22, 2014, *available at* http://dx.doi.org/10.1016/S0140-6736(14)60801-1]; Shannon K, Strathdee S, Goldenberg S, Duff P, Mwangi P, Rusakova M, Reza-Paul S, Lau J, Deering K, Pickles M, Boily M-C, *Global Epidemiology of HIV among female sex workers: influence of structural determinants*, The Lancet, July 22, 2014, *available at* http://dx.doi.org/10.1016/S0140-6736(14)60931-4; Beyrer C, Sullivan PS, Sanchez J, Dowdy D, Altman D, Trapence G, Collins C, Katabira E, Kazatchkine M, Sidibe M, Mayer KH, *A call to action for comprehensive HIV services for men who have sex with men*, The Lancet, 2012 Jul 28;380(9839):424-38. Epub 2012 Jul 20.

example, in 2013, Canada's Supreme Court ruled that prohibitions on public communication for the purposes of prostitution and "living off the avails of prostitution" violated the Canadian Constitution's right to security of the person. *See Canada (AG) v. Bedford*, 2013 SCC 72).[5] And mainstream organizations like Amnesty International and Lambda Legal called for the decriminalization of sex work. *See, e.g.*, Catherine Murphy, "Sex Workers' Rights Are Human Rights," Amnesty Int'l (Aug. 14, 2015), available at

https://www.amnesty.org/en/latest/news/2015/08/sex-workers-rights-are-human-rights/. These developments, coupled with previously unthinkable advances in state legislatures and the federal courts in the movement for gay rights, *see Obergefell v. Hodges*, --- U.S. ---, 135 S. Ct. 2584 (2015), led Rentboy.com to proudly announce its mission to an ever-wider audience.[6]

Even as Rentboy.com was expanding, Mr. Hurant experienced personal tragedies in 2014 with the loss of both his mother, ███████, and his longtime partner, to suicide. His mother, Edythe, had been his confidant since childhood and had worked closely with Mr. Hurant as the

---

[5]    *See* Exhibit A (Letter from Brenda Belak, Pivot Legal Services) (describing findings of the Canadian Supreme Court in *Bedford*, including that "working indoors was far less dangerous than street-based sex work" and that "client screening was essential to sex workers' safety," and noting that "[r]esearch conducted after the *Bedford* case with sex workers supports the conclusion that online advertising functions not only as a way of promoting an indoor business, but also as a security enhancing safeguard for sex workers, whether they work 'in-call' from stable premises or 'out-call' as escorts").

[6]    Around the same time, Mr. Hurant hired two additional attorneys, who promoted themselves as constitutional law experts that catered to the adult industry, to perform a top to bottom review of the Rentboy.com website. Although they cautioned that the government could take a different view, these lawyers advised Mr. Hurant that, in the event of a criminal prosecution, he would likely be protected by the First Amendment. This was a position that these lawyers had publicly espoused in the media and academic fora. *See, e.g.*, Lawrence G. Walters, *Shooting the Messenger: An Analysis of Theories of Criminal Liability Used Against Adult-Themed Online Service Providers*, 23 Stan. L. & Pol'y Rev. 171, 194 (2012) ("Basic free speech principles would appear to automatically prevent the imposition of criminal liability on escort classified sites based solely on their customers' content . . . .").

bookkeeper and *de facto* office manager at Rentboy.com. Following a 2012 diagnosis and a wrenching two-year battle against the disease, during which time Mr. Hurant, his father, and his brother cared for her, Edythe died in the summer of 2014. Mr. Hurant's longtime companion James Reyes had struggled for years ███████████████████████. At the same time as Mr. Hurant's mother was dying, Mr. Reyes ████████████████████████, in September 2014, committed suicide in the apartment he and Mr. Hurant shared. Mr. Hurant found his body. Shaken by these twin tragedies, Mr. Hurant ████████████████████████████████████ ██████████████████████.

### III. Arrest, Charges, Plea Allocution, PSR, and Guidelines Calculation

#### A. Arrest and Indictment

On August 25, 2015, agents from the Department of Homeland Security raided the Rentboy.com office and arrested Mr. Hurant and six employees of the company at their homes.[7]

---

[7] The arrests and the complaint, which described in salacious terms various sexual positions and sex toys, were criticized for being offensive and a misuse of government resources. *See* Rebecca Davis O'Brien & Mark Morales, *Gay Activists Protest Rentboy Raid*, The Wall St. Journal, Sept. 3, 2015, *available at* https://www.wsj.com/articles/gay-activists-protest-rentboy-raid-1441327676. The *New York Times* editorial page stated, "The criminal complaint is so saturated with sexually explicit details, it's hard not to interpret it as an indictment of gay men as being sexually promiscuous." The Editorial Board, *Homeland Security's Peculiar Prosecution of Rentboy*, N.Y. Times (Aug. 28, 2015), *available at* https://www.nytimes.com/2015/08/29/opinion/homeland-securitys-peculiar-prosecution-of-rentboy.html. Mainstream LGBTQ organizations like Lambda Legal criticized the move as threatening the safety of that community. Hayley Gorenberg, *Raiding Rentboy.com Threatens Our Safety*, Lambda Legal (Aug. 27, 2015), http://www.lambdalegal.org/blog/20150827_raiding-rentboy-threatens-our-safety. Members of Congress wrote to then-Attorney General Loretta Lynch and then-Homeland Security Secretary Jeh Johnson, expressing concern that "your decision to devote taxpayer resources to pursue this matter raises deeply troubling questions about the priorities of your departments and the motivations of those under your direction." Letter of Rep. Sean Patrick Maloney to Jeh Johnson and Loretta Lynch, Feb. 22, 2016; *accord* Letter of Rep. Jerrold Nadler to Jeh Johnson and Loretta Lynch, April 15, 2016 ("I am troubled by the targeting of this well-known website serving the LGBTQ community, and the rhetoric used by your agencies to describe the activities

The government ultimately dismissed the charges against all six of Mr. Hurant's co-defendants, but indicted Mr. Hurant on January 27, 2016 on three charges:  Promotion of prostitution, in violation of the Travel Act, 18 U.S.C. § 1952(a)(3)(A); money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

### B. Plea Agreement and Allocution

On October 7, 2016, pursuant to a plea agreement, Mr. Hurant pleaded guilty to Count One of the Indictment, which charged him with the promotion of prostitution in violation of the Travel Act, 18 U.S.C. § 1952(a)(3)(A).  *See* Plea Agreement, *United States v. Hurant*, No. 16-cr-45 (MKB) (E.D.N.Y. Oct. 7, 2016).  Mr. Hurant also entered a separate plea of guilty, pursuant to a separate plea agreement, on behalf of Easy Rent Systems to Counts One and Two, which charged Easy Rent with money laundering conspiracy in violation of 18 U.S.C. § 1956(h).  *See* Plea Agreement, *United States v. Easy Rent Systems, Inc.*, No. 16-cr-45 (MKB) (E.D.N.Y. Oct. 6, 2016).

At a plea hearing before Magistrate Judge Robert M. Levy, Mr. Hurant allocuted that "between January 1996 and August 2015," he "owned and operated a website called Rentboy.com" and "agreed with others to accept payments from multiple advertisers and promoted their exchange of sexual conduct in return for a fee in violation of New York State law."  Transcript of Plea Hearing at 39:3-8, *United States v. Easy Rent Systems, Inc.*, No. 16-cr-45 (MKB) (E.D.N.Y. Oct. 19, 2016), ECF No. 136.  Mr. Hurant further allocuted that Easy Rent "caused the proceeds of this unlawful activity to be deposited into the bank account of Easy Rent

it facilitates, which together raise serious concerns that there may have been a discriminatory bias at play in your pursuit of this matter."), attached hereto as **Exhibit C**.

Systems, Inc., and be used to further promote the unlawful activities of the website." *Id.* at 28:24 – 29:2. Judge Levy recommended that the pleas be accepted, *see id.* at 41:16-18, and this Court entered an Order accepting the pleas on November 3, 2016. *See* Order, *United States v. Easy Rent Systems, Inc.*, No. 16-cr-45 (MKB) (E.D.N.Y. Nov. 3, 2016).

In the plea agreement, the government estimates the likely adjusted offense level under the United States Sentencing Guidelines to be 14. Hurant Plea Agreement. ¶ 2 (Oct. 7, 2016). This estimate was based upon the government's determination that, pursuant to U.S.S.G. § 2E1.2(a)(2), the base offense level is calculated from the offense level of the Guideline applicable to the unlawful activity for which interstate travel or transportation was taken, and its further determination that the Guideline most likely to be applicable to the promotion of prostitution is U.S.S.G. § 2G1.1(a)(2), which provides for a base offense level of 14. *Id.* The government also determined that a four-level enhancement applies because Mr. Hurant was the organizer or leader of criminal activity involving more than five participants, pursuant to U.S.S.G. § 3B1.1(a), a two-level reduction applies based upon Mr. Hurant's acceptance of responsibility through his allocution and conduct prior to the imposition of sentence, pursuant to § 3E1.1(a), and a one-level reduction applies based upon Mr. Hurant's plea of guilty on October 7, 2016, which enabled the government to avoid preparing for trial and permitted the government and court to allocate their resources efficiently, pursuant to U.S.S.G. § 3E1.1(b). *Id.*

The plea agreement further states that if Mr. Hurant and Easy Rent enter guilty pleas pursuant to their respective plea agreements, and the pleas are accepted by the Court, "the government will seek a one-level reduction for a global disposition," pursuant to U.S.S.G. § 5K2.0. *Id.* ¶ 12. With this reduction, the total adjusted offense level estimated by the government is 14. *Id.* ¶ 2. The plea agreement further states that, assuming Mr. Hurant's

Criminal History Category is I, the recommended Guidelines sentence for an offense level of 14 is 15-21 months of imprisonment.  *Id.*  The parties did not stipulate to any Guidelines calculations, but Mr. Hurant agreed not to appeal or otherwise challenge a sentence with a term of 24 months or less of imprisonment.  *Id.* ¶ 4.

### C.  The PSRs

As of the time of this filing, we have not received the final Presentence Report ("PSR") addenda from the United States Probation Department.  Accordingly, we address issues contained within the draft PSRs and attach our objections to the draft PSRs as **Exhibit D**.

The PSR regarding Mr. Hurant, dated March 30, 2017, calculated a base offense level of 14, pursuant to U.S.S.G. §§ 2E1.1(a)(2) and 2G1.1(a)(2).  Hurant PSR ¶ 66.  Probation added four levels because Mr. Hurant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  *Id.* ¶ 69.  Probation then conducted a multiple count analysis pursuant to § 2G1.1(d)(1).  Because Probation found the offense involved more than five separate victims, each victim was treated as a separate count that could not be grouped, pursuant to U.S.S.G. § 3D1.2.  As such, the offense conduct involved more than five Units, resulting in a five-level increase in the combined offense level, pursuant to U.S.S.G. § 3D1.4.  Probation then found that a two-level reduction was warranted, pursuant to § 3E1.1(a), due to Mr. Hurant's acceptance of responsibility, and an additional one-level reduction was warranted, pursuant to § 3E1.1(b), because he provided the government with timely notice of his intent to enter a plea of guilty.  Thus, Probation calculated a total offense level of 20.  *Id.* ¶ 80.

Because Mr. Hurant has no criminal history, his criminal history score is zero and his Criminal History Category is I.  *Id.* ¶ 83.  The Guidelines sentencing range for an individual with an offense level of 20 and a Criminal History Category of I is 33 – 41 months' imprisonment.

In discussing factors that may warrant departure, Probation noted, "Rentboy.com had hundreds, if not thousands, of victims. Per Application Note 6 of Guideline 2G1.1, an upward departure may be warranted if the offense involved more than 10 victims." *Id.* ¶ 136. However, Probation also noted that the government had not identified any victims of the offense. *Id.* ¶ 20.

Finally, Probation noted that the condition set in the plea agreement for a one-level reduction in the Guidelines range – that "by October 21, 2016, the defendant and Easy Rent Systems, Inc., both plead guilty" – "has been fully satisfied" and that "[i]f this agreement is accepted by the Court, the advisory guideline range is from 30 to 37 months." *Id.* ¶ 137.

The PSR filed by Probation relating to Easy Rent, dated April 18, 2012, acknowledged that Easy Rent entered into its own plea agreement and that, because Easy Rent "pleaded guilty and has ceased conducting business," it has "clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct." Easy Rent PSR ¶ 34. In calculating the Guidelines for Easy Rent, the PSR noted that, because Easy Rent operated primarily for a criminal purpose or primarily by criminal means, the fine is to be set at an amount sufficient to divest it of all of its net assets, pursuant U.S.S.G. § 8C1.1, subject to the statutory maximum of $500,000. *Id.* ¶¶ 28, 48, 50. However, the PSR also stated that, because Easy Rent "ceased operation in August 2015," it "has no net worth, as the corporate bank accounts have been seized for forfeiture," *id.* ¶ 41, and provided a list of the property forfeited. *See id.* ¶ 49. Finally, the PSR noted that the court shall order a term of probation of at least one year but not more than five years, pursuant to U.S.S.G. § 8D1.2(a)(1), if necessary to secure payment of restitution, ensure that changes are made within the organization to reduce the likelihood of future criminal conduct, if the sentence imposed on the organization does not include a fine, or if necessary to

accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).  *Id.* ¶ 54.  Probation

did not opine as to whether such a probationary sentence would be appropriate.

## ARGUMENT

**I.      The Presentence Report Incorrectly Calculates the Sentencing Guidelines**

**A.      The Base Offense Level Should Be Calculated Pursuant to U.S.S.G. § 2X5.2**

The Guideline applicable to the Travel Act, 18 U.S.C. § 1952, is U.S.S.G. § 2E1.2, which

provides that the base offense level is the greater of 6 or "the offense level applicable to

the . . . unlawful activity in respect to which the travel or transportation was undertaken."

U.S.S.G. § 2E1.2.  Where, as here, "the underlying conduct violates state law, the offense level

corresponding to the most analogous federal offense is to be used."  *Id.* § 2E1.2 Application Note

2.  Here, the underlying offense is the promotion of prostitution.  The PSR states, in conclusory

fashion, that Guideline § 2G1.1(a)(2) is appropriate.  *See* Hurant PSR ¶ 36.  We disagree.  The

Second Circuit has not addressed the issue of which federal offense is most analogous to New

York state laws prohibiting the promotion of prostitution.  The federal offenses to which

U.S.S.G. § 2G1.1 applies involve the interstate or international *transportation* of individuals who

engage in prostitution, *see, e.g.*, 18 U.S.C. § 2421 (prohibiting "knowingly transport[ing] any

individual in interstate or foreign commerce . . . with the intent that such individual engage in

prostitution").[8]  By contrast, the New York state laws applicable here concern one who

_____

[8]      In addition to 18 U.S.C. § 2421, U.S.S.G. § 2G1.1 also applies to 8 U.S.C. § 1328, which
prohibits "*importation* into the United States of any alien for the purpose of prostitution," 18
U.S.C. § 1591, which prohibits sex trafficking of children, 18 U.S.C. § 2422, which prohibits
"knowingly persuad[ing], induc[ing], entic[ing], or coerc[ing] any individual to travel in
interstate or foreign commerce . . . to engage in prostitution," and 18 U.S.C. § 2237(b)(4), which
prohibits persons aboard military vessels from engaging in conduct that involves "knowing
transportation under inhumane conditions."

"*advances or profits* from prostitution," *see* N.Y. Penal Law § 230.20(1) (emphasis added); *id.* § 230.25.[9] Thus, a more analogous statute is 18 U.S.C. § 1384, which prohibits "engag[ing] in prostitution or aid[ing] or abet[ting] prostitution or procur[ing] or solicit[ing] for purposes of prostitution, or keep[ing] or set[ting] up a house of ill fame, brothel, or bawdy house" near military or naval bases. That statute, like the state law provisions at issue here, is targeted at the *facilitation* of prostitution, rather than *transportation* of individuals who engage in prostitution. Because a violation of 18 U.S.C. § 1384 is a Class A misdemeanor not covered by a specific Guideline, the base offense level is six, pursuant to U.S.S.G. § 2X5.2(a). If the remaining adjustments set forth in the PSR, *see* Hurant PSR ¶¶ 36-80, and the one-level reduction based upon the Plea Agreement, *id.* ¶ 137, are applied, the total offense level is 12. As noted above, Mr. Hurant has no criminal history, so his Criminal History Category is I. *See id.* ¶ 83. The Guidelines range for an offense level of 12 and a Criminal History Category of I is 10-16 months' imprisonment. *See* U.S.S.G. § 5 (Sentencing Table).

If, for the reasons explained in Section I.B, *infra*, the multiple count analysis does not apply, application of the remaining adjustments in the PSR results in a base offense level of 7. *See id.* ¶¶ 36-71, 78-80, 137. The Guidelines sentencing range for an offense level of 7 and a Criminal History Category of I is 0 to 6 months' imprisonment. U.S.S.G. § 5 (Sentencing Table). Because this range is within Zone A of the Sentencing Table, a sentence of probation is authorized, pursuant to U.S.S.G. § 5B1.1(a)(2).

---

[9]     Mr. Hurant also pled guilty to violating New York Penal Law § 115.00, which is not directed at prostitution specifically but, rather, "conduct which provides [a] person with means or opportunity for the commission" of a crime. N.Y. Penal Law § 115.00.

**B.      A Multiple Counts Enhancement Does Not Apply**

Though Mr. Hurant pled guilty to a single count of promoting prostitution, Probation applied a five-level enhancement for multiple counts pursuant to the special instruction in U.S.S.G. § 2G1.1(d), *see* Hurant PSR ¶ 35, which provides, "[i]f the offense involved more than one victim, Chapter Three, Part D (Multiple Counts) shall be applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction."  U.S.S.G. § 2G1.1(d)(1).  However, that instruction does not apply here.  For purposes of § 2G1.1, the term "victim" is defined to include a "a person transported, persuaded, induced, enticed, or coerced to engage in, or travel for the purpose of engaging in, a commercial sex act or prohibited sexual conduct."  U.S.S.G. § 2G1.1 Application Note 1.  The users of Rentboy.com do not fall within this definition of "victim."  Mr. Hurant did not transport anyone using Rentboy.com to locations where they engaged in sexual conduct and did not coerce anyone to engage in sexual conduct.  Nor did he "persuade[ ], induce[ ], or entice[ ]" anyone, because the Second Circuit has held – in a case interpreting the Mann Act, which, like U.S.S.G. § 2G1.1, applies to one who "persuades, induces, entices, or coerces any individual" to engage in sexual activity, 18 U.S.C. § 2242 – that "ma[king] a sexual act more appealing" does not does not establish the requisite "intent to entice," which requires proof that the defendant "attempted to *convince or influence* the person . . . to engage in a sexual act." *United States v. Joseph*, 542 F.3d 13, 18 (2d Cir. 2008) (emphasis added).

Moreover, there do not appear to be any reported cases applying this Guideline to a situation analogous to the one here, in which a defendant only facilitated sexual conduct, without taking some direct action to cause such conduct to occur.  Rather, all of the reported cases applying this Guideline involve situations in which the defendant took a *direct*, *active* role in

facilitating the sexual conduct, either by directly engaging in sexual conduct with a person, *see, e.g.*, *United States v. Wernick*, 691 F.3d 108, 111 (2d Cir. 2012) ("At trial, the government was able to prove . . . [defendant] met a male 14-year-old . . . in person several times to engage in oral and anal sex"),[10] physically transporting a person to a particular location to engage in sexual conduct, *see, e.g.*, *Lejhanec v. United States*, No. 99-cv-4387 (ILG), 1999 WL 1487594, at *1 (E.D.N.Y. Nov. 29, 1999) ("[D]efendant's role in the conspiracy extended from meeting the women at the airport, to driving them each day to and from the bars where they worked, to collecting money from the women each week."),[11] or setting the financial terms of the transaction in which a person would engage in sexual conduct (by, for example, setting the rate a

---

[10]     *See also United States v. Weiner*, 518 F. App'x 358, 360 (6th Cir. 2013) ("Defendant engaged in prohibited sexual conduct with [the victims] while they were minors."); *United States v. Giordano,* 324 F. Supp. 2d 349, 352 (D. Conn. 2003), *aff'd*, 442 F.3d 30 (2d Cir. 2006) ("Defendant was . . . sexually abusing the two minor victims."); *United States v. Long*, 185 F. Supp. 2d 30, 41 (D.D.C. 2001) (defendant "gave [a victim] oral sex" and another victim "reported numerous instances of sexual activity with the defendant").

[11]     *See also United States v. Flanders*, 752 F.3d 1317, 1326 (11th Cir. 2014) (defendant "drove the women to another location" to engage sexual conduct); *United States v. Monsalve*, 342 F. App'x 451, 453 (11th Cir. 2009) (defendant "transported [victims] from city to city" and "delivered them to customers"); Brief of Appellee at 3, *United States v. Yang*, No. 04-3283 (8th Cir. Feb. 24, 2005), ECF No. 21 (defendant "provided transportation to and from various hotels for [the victims]"); *United States v. Spruill*, 296 F.3d 580, 591 (7th Cir. 2002) (defendant "sent another prostitute in his employ . . . to transport [a victim] to Chicago"); *United States v. Curtis*, 234 F.3d 1270, 2000 WL 1679515, at *2 (6th Cir. 2000) (defendant managed an escort service that, among other things "drove prostitutes to and from their illicit assignations"); *Arrick v. United States*, No. 2:14-CR-108(1), 2016 WL 3880899, at *4 (S.D. Ohio July 18, 2016) (defendant pled guilty to sex trafficking by force, fraud, or coercion and three victims stated in investigative interviews that defendant "transported" them to engage in commercial sexual activity, and two victims stated defendant "threatened . . . physical violence"); *United States v. Johnson*, No. 15-cr-006 (DLC), 2016 WL 2869774, at *2 (D. Mont. May 16, 2016) (defendant "transported in interstate commerce five persons . . . with the intent that they would engage in prostitution"), *United States v. Kum*, 309 F. Supp. 2d 1084, 1088 (E.D. Wis. 2004) (defendant "was involved in a conspiracy to smuggle girls from Thailand to Singapore for purposes of prostitution").

person would charge for sexual services), *see, e.g.*, *United States v. Wild*, 143 F. App'x 938, 940 (10th Cir. 2005) (defendant "approached men and spoke to them in Spanish about how much the men would pay to have sex with [a victim]").[12]

Here, Mr. Hurant did not take any direct, active role in facilitating sexual conduct and, for the reasons noted above, did not otherwise engage in interactions with Rentboy.com's users that would bring them within the definition of "victim" applicable to U.S.S.G. § 2G1.1. Indeed, the PSR notes that the government has not identified any victims in this case. Hurant PSR ¶ 20. Thus, the type of conduct that Mr. Hurant engaged in did not involve multiple "victims" and, as such, the enhancement for multiple counts in U.S.S.G. § 2G1.1(d)(1) does not apply. For the same reasons, an upward departure under Application Note 6 of U.S.S.G. § 2G1.1 is not warranted.

## II.     The § 3553(a) Factors Support a Non-Guidelines Sentence

Though a sentencing court must consider the "kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [Guidelines]," 18 U.S.C. § 3553(a)(4), "calculating the correct

---

[12]      *See also United States v. Young*, 590 F.3d 467, 473 (7th Cir. 2009) (defendant "hired workers, assigned them to customers, [and] handled the spa's finances" and "confin[ed] [employees'] income to the 'tips' they received for providing sexual massages"); *United States v. Reiner*, 500 F.3d 10, 17 (1st Cir. 2007) (defendant operated a health club that purported to be a massage parlor but "offered sexual services in exchange for money" and defendant "was responsible for all personnel decisions concerning the female masseuses and handled the financial aspects of the business"); *United States v. Castillo*, 256 F. App'x 295, 296 (11th Cir. 2007) (defendant "received money from patrons, distributed tokens which the patrons would then give to the prostitutes, and collected money from the prostitutes at the end of the day"); *Curtis*, 2000 WL 1679515, at *2 (6th Cir. 2000) (defendant "made promises to the women concerning the amount of money that could be made for engaging in prostitution"); *Murphy v. United States*, No. 3:07-cr-259, 2014 WL 2565684, at *5 (N.D. Ohio June 6, 2014) (briefly discussing the definition of "victim" set forth in § 2G1.1, and suggesting women were "victims" when defendant "established the prices which the women would charge for their services").

Guideline range [is] just an initial step in the sentencing process." *United States v. Al Halabi*, 563 F. App'x 55, 57 (2d Cir. 2014) (internal quotation marks omitted). A "'district court may not presume that a [G]uidelines sentence is reasonable.'" *Id.* (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). Rather, the court must "make an individualized assessment based on the facts presented." *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (quoting *Gall v. United States*, 552 U.S. 41, 50 (2005)). In conducting this assessment, courts have an "overarching duty 'to impose a sentence sufficient, but not greater than necessary, to serve the purposes of sentencing.'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a) (2012)). These purposes include: "[t]he need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; . . . to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). Courts must also consider the remaining factors set forth in § 3553(a), including "the nature and circumstances of the offense and the history and personal characteristics of the defendant." *Id.* § 3553(a)(1). The Supreme Court has "emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Pepper*, 562 U.S. at 487-88 (citations omitted) (alterations in original). For the reasons explained below, each of the relevant § 3553(a) factors supports a non-incarceratory sentence.

### A. The Nature and Circumstances of the Offense Support a Non-Guidelines Sentence

#### 1. Rentboy.com Was Run in a Professional and Conscientious Manner

The promoting prostitution law to which Mr. Hurant pled guilty was enacted principally to target "the conscienceless vampires who make merchandise of the passion of men." *People v. Jelke*, 135 N.E.2d 213, 217 (N.Y. 1956). That image stands in stark contrast from the way in which Mr. Hurant ran his business. Individuals who are familiar with Rentboy's practices and culture overwhelmingly describe it as humane and reputable. Despite the threat of exposure, numerous company employees have written letters describing the company's "culture of ethical and responsible treatment of advertisers." Exhibit A (Letter of Brandon Baker). The office was run "with nerdish intensity and focus that was more Silicon Valley than Red Light District." *Id.* (Letter of Christopher J. Johnson). It was a "clean, friendly work environment" where the employees felt like "an artistic and gentle family." *Id.* (Letter of Leo Herrera). Mr. Hurant imparted a message "that we could not [be] successful if we did not care about the well-being of our customers. The escorts, bodyworkers, etc. who advertised . . . were not bags of money to be exploited." *Id.* (Letter of Daniel W.K. Lee). As Leo Herrera, an employee of the company for four years, states, "As with any field that deals with sex and money, there were pitfalls and risks, but that was the exactly what we worked against. . . . We did not feel above the law. In fact, at all times we tried to be transparent with the government while abiding by a strong moral code for our community." *Id.* (Letter of Leo Herrera).

Mr. Hurant also treated his employees well, "with admirable policies on work-life balance while being an equal opportunity employer who ha[d] a wonderfully diverse workplace." *Id.* (Letter of James Glaser). Xiaquon Li, a programmer who worked for the company, describes what attracted him to the position: "[A] competitive salary of $120,000 with generous time off,

excellent health insurance, dental coverage, life insurance, 401K, etc." *Id.* (Letter of Xiaquan Li). He notes that Mr. Hurant hired people of all different backgrounds and sexual orientations, many of the technology-side employees worked at the company for close to or over a decade, something "unheard of" in the IT job market, and that Mr. Hurant "operated the company with honesty and integrity." *Id.*

Michael Sean Belman, who was the company's director of marketing and events and was arrested along with Mr. Hurant, provides a broad assessment of the company, noting that both he and Mr. Hurant knew LGBTQ escorts and the company operated in "common cause with escorts and [with] an ethos of respect for male sex workers in particular, that grew out of shared life experiences with them." *Id.* (Letter of Michael Sean Belman). The company was "a pleasant and professional place to work" whose "customers were the escorts themselves." *Id.* Indeed, the staff felt that "[w]e worked <u>for</u> the escorts; they did not work for us." *Id.*

Individuals who dealt with the company from the outside also found the Rentboy.com staff to honest and straightforward. "They treated everyone with respect and they tried to uphold their obligation as a corporate citizen." *Id.* (Letter of David Katz). "The business was organized and professional." *Id.* (Letter of Liah Alonso). "Every promise to pay was always fulfilled." *Id.* (Letter of Morgan Sommer). The company's events were "always professionally and responsibly organized," "done with humor and style," and "in a highly professional manner." *Id.* (Letter of Michael Musto). Mr. Hurant in particular had "a sterling reputation in [his] industry as a benevolent, trustworthy, and gracious individual who is committed to bettering the health, safety and future of the workers that used his platform." *Id.* (Letter of Eric Paul Leue and Siouxsie Q. James).

Mr. Hurant was more than just an honest businessman. From the outset, Mr. Hurant's principal motivation for starting and maintaining Rentboy.com was to create a safe, sex-positive space for gay men in his community and to promote the livelihood and wellbeing of escorts. While Mr. Hurant eventually made a good living from Rentboy's revenues,[13] he invested a substantial share of its profit in services for the advertisers themselves, including programs that provided education on sexually-transmitted disease prevention, courses in financial management, and counseling for individuals who wished to *leave* sex work. He also put the company's money into scholarships for advertisers who wanted to pursue educational opportunities while working as escorts. Courts have found that the absence of greed as a motivating factor for criminal conduct weighs significantly in favor of leniency in sentencing. *See Thavaraja*, 740 F.3d at 260 (affirming below-Guidelines sentence where defendant "was not motivated by 'power' or 'self-aggrandizement'"); *United States v. Connors*, No. 06-cr-189 (JRP), No. 2007 WL 29655612, at *4 (E.D. Pa. Oct. 9, 2007) (noting that "motivation is clearly a circumstance of [an] offense since it can both motivate and aggravate culpability" and finding that a defendant's "lack of greed" was a relevant consideration under the § 3553(a) factors).

Mr. Hurant also used the company's platform to support numerous charitable and worthwhile causes. Letters contained in Exhibit A show Mr. Hurant time and again dedicating

---

[13]     Media reports and the Indictment announced that Rentboy had over $10 million in revenue between 2010 and 2015. *See* Indictment ¶ 2. That figure represents *gross* revenue, the bulk of which was reinvested in the company and used to pay its employees a living wage. At the end of the day, the profits of Rentboy.com netted Mr. Hurant roughly $300,000 annually – a significant sum by any measure but hardly the haul of a kingpin. The substantial majority of the money that Mr. Hurant made over the two decades of Rentboy's existence was from his lawful computer consulting business.

his efforts and the company's resources to various socially beneficial activities. Most significant, perhaps, is Rentboy's extensive collaboration with the Center for HIV/AIDS Educational Studies and Training (CHEST) at CUNY School of Public Health. Christian Grov, an associate professor at CUNY, describes a relationship with the company that goes back to 2004, in which he witnessed "Mr. Hurant's deep commitment to HIV prevention, improving the lives of those living with HIV, and to improving the lives of men who choose to be escorts." Exhibit A (Letter of Christian Grov). This commitment included "providing CHEST with free banner ads on Rentboy and including information about our research opportunities on the Rentboy newsletter," as well as collaborating "to develop a survey of men on the[ ] site," including providing "feedback on our survey in addition to providing free advertising on the[ ] website/newsletter to promote participation." *Id.* These actions resulted in over four hundred escorts participating in the survey, which Dr. Grov believes may be the largest of its kind, the findings of which have been published in peer-reviewed academic journals. *Id.* Juline Konen, another HIV researcher affiliated with CHEST, similarly notes that Mr. Hurant "often used his leadership role at Rentboy, and in the gay community generally, to promote messages of sexual risk reduction and a culture of self-care." *Id.* (Letter of Juline Konen).

These contributions are widely recognized in the field of public health. Dr. Chris Beyrer of the Department of Epidemiology at Johns Hopkins Bloomberg School of Public Health, who does not know Mr. Hurant and did not work in collaboration with the company, nevertheless recognizes its significant contributions to public health such that, he states in his letter, "The many activities undertaken by RentBoy.com under Mr. Hurant's leadership are clear and compelling evidence of his company's commitment to reducing HIV risks, to safety for all engaged in the use of the site, and to public health more broadly." *Id.* (Letter of Chris Beyrer).

In addition, Mr. Hurant dedicated Rentboy's resources to promoting a variety of other charitable causes, including: Providing discounted workspace to a social networking website for individuals with chronic and serious health conditions, *id.* (Letter of Carl Sandler); donating printing services for a nonprofit that provides arts funding to underserved communities, *id.* (Letter of Stefan Pildes); fundraising for HOOK, a peer education group teaching "men in the sex industry safest and best practices," *id.* (Letter of Daniel W.K. Lee); support of Gay Men's Health Crisis, Body Positive, and fundraising for survivors of New York Fire Department ladder company after 9/11, *id.* (Letter of Sean Strub); and funding of workshops about legal rights for the Urban Justice Center, *id.* (Letter of Melissa Broudo).[14] Such dedication to charitable pursuits undermines any notion that Mr. Hurant was engaged in the business purely to profit off the exploitation of Rentboy's advertisers. To the contrary, he made significant efforts to position the company as a force for public good, a highly relevant factor in this Court's § 3553(a) analysis. *See United States v. Canova*, 412 F.3d 331, 359 (2d Cir. 2013) (affirming downward departure where "[t]he record plainly demonstrates the 'exceptional degree' of [the defendant's] public service and good works"); *United States v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003) (affirming downward departure based on, among other factors, the defendant's charitable works); Sentencing Transcript at 22:25 – 23:2, *United States v. Collins*, No. 07-cr-1170 (LAP) (S.D.N.Y. Oct. 17, 2013), ECF No. 244 (imposing below-Guidelines sentence where defendant "worked for his church, his family, his schools, and numerous other deserving organizations that work to

---

[14]     Moreover, Mr. Hurant dedicated his own personal time to creating invites, flyers, banners, and help with events for an organization that provides artistic opportunities for children, *id.* (Letter of Christopher Hardwick), and providing free technological assistance to the Jim Owles Democratic Club and other non-profit organizations in the LGBT community, *id.* (Letter of Thomas D. Shanahan).

better individuals' lives for decades"); *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012) (imposing below-Guidelines sentence where defendant "devoted a huge amount of time and effort to a very wide variety of socially beneficial activities")

### 3. Escorts Themselves Considered Rentboy.com as a Positive Force in Their Lives

The genuine care that Mr. Hurant had for the advertisers on the site – and the significant benefits Rentboy provided to its advertiser base – are evidenced by the testimonials of numerous escorts who used the site.[15]  J.W. describes how "[a]t 18, I freed myself from an upbringing marked by abuse, control, and religious zealotry."  Exhibit A (Letter of J.W.).  While this escape was liberating, he soon found himself "homeless and jobless, sleeping on strangers' sofas, sometimes going days between meals."  He began working as a sex worker, dancing at a strip club where the management exploited the workers' desperate financial situation, charging high fees for using the club to meet clients.  J.W. first heard of Rentboy.com because the club's management banned dancers who advertised on the site.  He logged on and, to him, "it became obvious why they saw the site as a threat.  Rentboy required nothing but a reasonable, transparent listing fee."  *Id.*  J.W. began using the site, and notes that he could now "choose which clients to see and where, avoiding people and situations that seemed unsafe."  *Id.*  He was able to make more money and have a more flexible schedule, which he used to enroll in art and design school.  Upon graduating, he moved to New York and began his dream career in advertising and design.  He happened to meet Mr. Hurant there and periodically worked for Rentboy – no longer as an escort, but now designing promos and posters for the company.  J.W.

---

[15]     To protect these individuals' identities, we have redacted their names and will file unredacted versions of their letters under seal.

notes that Mr. Hurant "built a service that safely connected escorts and clients without extorting either. He enabled me and countless others to pursue our dreams of higher education." *Id.*

D.G. had a similar experience of the website and of Mr. Hurant. He was an advertiser on the site when he met Mr. Hurant in 2011. He states: "For me, rentboy.com provided a safe way of screening, vetting and connecting with my clients. Mr. Hurant and his team were always respectful of my autonomy and provided many opportunities for adult entertainers to promote their brands and stay safe while doing it." *Id.* (Letter of D.G.). D.G. especially cites the resources that were made available to him through Rentboy U, recalling a workshop led by a nurse from an STD testing facility on HIV prevention and access to medication, as well as classes "on subjects like financial planning and ways to transition out of the adult industry." *Id.* Such classes would be an odd choice for an individual whose goal was to exploit the labor of escorts for the highest profit margin.

J.M.M.U. also faced difficult economic circumstances when he was young and turned to escorting in his native Spain (where prostitution has been decriminalized since 1995) to make ends meet. *See id.* (Letter of J.M.M.U.). This was prior to his discovering Rentboy.com. When he did, he writes, "my life was divided into a before and an after." *Id.* He explains that Rentboy allowed him to convey to potential clients "a certain distinction and dependability" and to carefully curate the kinds of clients he wanted to attract. *Id.* He began to earn enough money to live independently and support his family. He "understood that Rentboy.com was only concerned with generating traffic to my ad" and "never felt as though I was obligated in any way to continue paying for my ads." *Id.* In 2014, J.M.M.U. participated in one of Rentboy's "Hookies" awards and won "Best Escort" in Spain. *Id.* The awards were lambasted in the

complaint and the Indictment as being a brazen flaunting of the site's lawlessness, but

J.M.M.U.'s description of his experience puts them in a different perspective:

> The presenter at the event called me up to the stage in front of my mother and, like never before, I saw that she was so proud of me. Finally I had done something right, I had become honest and professional. I was finally receiving public approval for work that I previously felt was seen by society as marginal.

*Id.* While one can quarrel with whether making people feel pride in activity that is illegal (at

least in the United States) is indeed a public good, it cannot be disputed that this was one of

Mr. Hurant's goals in starting Rentboy.com – a goal that he undertook significant efforts to

achieve – and that in the community Mr. Hurant was part of, this work was in fact viewed as

positive and salutary.[16]

### 4. The Indictment's Allegations of Questionable Practices, While Serious, Are Significantly Overstated

The Indictment references two areas where, it alleges, Rentboy.com failed to live up to its

goal of supporting and protecting advertisers, namely, its business dealings with escort services,

or agencies, and issues regarding age verification in the company's expansion to the Asian

market. *See* Indictment ¶¶ 13-20. We do not argue that Rentboy.com's policies were perfect.

Nor would Mr. Hurant make that claim, though each of his policies was well-intended and vetted

with multiple lawyers who advised the company.

---

[16] The letter of Richard Mitchell, who was a photographer for the company from 2005 on similarly describes his discussions with numerous escorts over a decade about "how their lives had been enriched from the income, travel experiences, and professional contacts made through Rentboy. Many mentioned the health care, safety tips, and financial advice they received through Rentboy U. They knew they could turn to Rentboy for advice if they were in trouble. Rentboy was invested in their health and success as well as that of the LGBT community." *Id.* (Letter of Richard Mitchell).

First, with respect to escort agencies, although Rentboy.com dealt with them, especially in the early years of its business, those dealings became vanishingly rare over the course of the company's nearly two-decade existence, because online services like Rentboy drove escort agencies out of business. Indeed, replacing the agency model with one where escorts could advertise directly to clients and control their own business was one of the purposes of Rentboy.com. The Indictment points to a discount code the company used, "AGENCY15" as evidencing a facilitation of escort agencies. Indictment ¶ 13. But that discount was applied to any escort who had three or more ads, which was common for advertisers working in multiple cities. *See* Hurant PSR ¶ 18. Thus, the "AGENCY15" designation is not an accurate indicator of Rentboy's willingness to do business with escort agencies.[17]

Second, with respect to the Asian market, when Rentboy would expand into a new market, the company would start out by offering free ads that would generate an initial flood of new submissions. There was concern within the company that when this happened, they had more work to do to vet the ads and ensure that they complied with their publishing standards. This happened, for example, in 2014, when the site expanded to South Africa: They received many new ads and the site's administrator's urged the employees to be highly vigilant to screen for content and age verification. The same thing happened when they expanded to Asia – the site received ads of dubious quality: many seemed like spam, such as multiple submissions of the

---

[17] The Indictment cites one case in which, it states, Rentboy transacted with individuals who were later arrested and charged with racketeering and sex trafficking in Miami-Dade County court "for luring Hungarian men into the United States, and then forcing them into sexual slavery." Indictment ¶ 16. Rentboy cooperated in the investigation of these individuals, providing details about their identities, financial instruments, locations, IP addresses, email addresses, and other information to law enforcement, and based in part on the evidence that the company provided, they were convicted and sentenced to lengthy prison terms.

same ad.  Mr. Hurant encouraged the staff to keep up with screening these ads because this was the way to establish the site's presence in a new market.   But neither he nor anyone else at the company ever directed any employee to relax the verification standards or abandon their vetting process.  As one former employee puts it, "[B]y the site's guidelines and Mr. Hurant's vision it was paramount to be extra vigilant of any inappropriate copy but *above anything else* to make sure the users [were of] legal . . . age."  Exhibit A (Letter of Hector Galvis) (emphasis added).[18]

Despite these good intentions, Mr. Hurant acknowledges that, although he believes it is possible to mitigate the risk of harm inherent in prostitution, there may be no way to eliminate it entirely, especially while it remains illegal and not subject to government regulation.  Nevertheless, the facts distinguish this case from those aggravated cases involving trafficking, pimping, or the exploitation of minors.  Accordingly, the nature and circumstances of the offense here warrant a below-Guidelines sentence.

### B.  Mr. Hurant's Personal History and Characteristics Support a Non-Incarceratory Sentence

Courts have found below-Guidelines sentences warranted where, as here, there are "numerous letters attesting to [defendant's] good character and his many acts of charity."  *United States v. DiMattina*, 885 F. Supp. 2d 572, 582 (E.D.N.Y. 2012); *see also United States v. Echeverri*, No. 10-cr-698, 2011 WL 3664343, at *2 (E.D.N.Y. Aug. 12, 2011) (imposing sentence of time-served where "[n]umerous letters submitted to the court by family members

---

[18]    The Indictment references an email in which a Rentboy employee states, "In Asia ok to approve them…unless you see a baby…:)."  Indictment ¶ 20.  This reference takes a sarcastic comment out of context.  That remark was made in an email exchange between two Rentboy.com employees (neither of which is Mr. Hurant, who is not cc'ed on the email) discussing the fact that they *did* require identification to verify the age of an advertiser and that they had removed the advertisement from the site because they had not yet received such verification.  It is therefore clear in context that the remark was off-color and not a statement of company policy.

attested to defendant's good character"); *United States v. Hodges*, No. 07-cr-706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) (imposing below-Guidelines sentence where "[m]ultiple members of defendant's family, friends, and colleagues have written detailed letters to the Court attesting to defendant's commitment . . . to his community"); *United States v. Toback*, No. 01-cr-410 (RWS), 2005 WL 992004, at *5 (S.D.N.Y. Apr. 14, 2005) (imposing sentence of time-served when "an abundance of letters from [the defendant's] family, colleagues and friends speak to his outstanding and reliable character"). The voluminous record set forth in the letters submitted in support of Mr. Hurant speak to his remarkable kindness, his care for others, and his good character.

What stands out in the nearly seventy letters submitted on Mr. Hurant's behalf is how many of them contain individual stories of Mr. Hurant reaching out to take care of and comfort a friend in a time of need. Brandon Baker recalls how Mr. Hurant "comforted me to my core" when his parents committed suicide. Exhibit A (Letter of Brandon Baker). Christopher Hardwick met Mr. Hurant when he approached Mr. Hardwick and helped him repair his broken-down vehicle, and has since relied on Mr. Hurant in moments of personal crisis: "When I felt I couldn't go on any longer he saved me from despair." *Id.* (Letter of Christopher Hardwick). He provided "moral and economic support" to an employee, Hector Galvis, when he was diagnosed with ▮▮▮▮▮▮▮. *Id.* (Letter of Hector Galvis). When Kyle McDowell's partner died ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮, he recalls, "Jeffrey came rushing to my side in minutes. He created a practical shield of protection around me, sparing me difficult intrusions, decisions, and shoring up my financial concerns that very morning." *Id.* (Letter of Kyle C. "Hush" McDowell). Mr. Hurant continued to care for his friend for months after this tragedy. *Id.* Mr. Hurant provided support to his friend, Larry Dvoskin, a musician who was in danger of losing his home, but for

Mr. Hurant's "financially life saving gesture." *Id.* (Letter of Laurence A. Dvoskin). The author Michael Cunningham describes the kindness Mr. Hurant has shown to his 19-year-old godson, who needed "as many moral and loving adult role models as he can get." *Id.* (Letter of Michael Cunningham). Naomi Less, a spiritual leader in Mr. Hurant's synagogue, describes the empathy and "cloak of comfort" Mr. Hurant wrapped her in when she lost her mother. *Id.* (Letter of Naomi Less). Mr. Hurant helped Ron Haviv through a relationship crisis, acting as "a loyal friend and a caring person." *Id.* (Letter of Ron Haviv). He invited Vince Errico to spend the holidays with him and his family, knowing that he might be alone at that time of year. *Id.* (Letter of Vince Errico). And Mr. Hurant responded to his cousin Steve Wertheim's having a daughter ███████████████████████ by opening a college fund for the girl – "In doing so," Mr. Wertheim writes, "he inspired our confidence in her at a time when my wife and I were struggling with our circumstance." *Id.* (Letter of Steve Wertheim).

The letters in support of Mr. Hurant go well beyond merely attesting to his good character; they include specific, individual stories of caring and compassion. As noted above, Mr. Hurant has endured his own share of tragedies. He case supported many friends in need, and has cared for three of the closest people to him, all of whom he lost: The first was his boyfriend Jorge, who died ███████ in 1992. John Munford describes meeting the couple at the time: "I saw Jeff nurse Jorge for two long years during which he was in and out of the hospital all the time. Many other people would have walked away, but Jeffrey stayed the course, taking care of Jorge right until the end." *Id.* (Letter of John Munford). Although Mr. Hurant ███████████████ ██████during his monogamous relationship with Jorge, he remained committed to him, caring for him until his death and returning his body to his parents for burial in his home country of Ecuador.

The second was his mother, Edythe: They were friends, confidants, and they worked together at all his companies, including Rentboy.com. Edythe was a constant presence at the company for several years. She knew the business thoroughly, serving as its bookkeeper, and knew all the people who worked there. Edythe was beloved at Rentboy.com, where she worked until after she was diagnosed ████████████████████████ in 2012. During her long battle against the disease, Mr. Hurant was always there for his mother. Family friends Gail and Albert Marian describe how "Jeff was ever at her side to care for her when Les could not be and even when he could." *Id.* (Letter of Gail and Albert Marian). Edythe stayed with Mr. Hurant in Manhattan while she was undergoing treatment ████████████████████. Mr. Hurant was devastated by his mother's passing.

Finally, six weeks after his mother's passing, Mr. Hurant's partner of twenty years, committed suicide. James Reyes had been a brilliant psychiatrist, with a promising career; but ████████████████████████████████████████████████ ████████████████████. Daniel Babush describes a scene in which ████████████ ████████████████████████ and the havoc it wreaked on his and Mr. Hurant's lives during a ski trip the couple took with friends:



*Id.* (Letter of Daniel Babush). Mr. Hurant continued to care for Mr. Reyes for years ████████ ████████████████████. In September 2014, just a few weeks after Mr. Hurant's mother died, he found Mr. Reyes's body in their apartment.

These twin tragedies, occurring so close together, shattered Mr. Hurant's life. Vulnerable and overwhelmed, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

At the same time, these events prompted Mr. Hurant to recommit himself to spiritual pursuits and led him to create new communities. Mr. Hurant has been a member of Lab/Shul, an alternative, experimental Jewish community that celebrates "contemplation, life cycle rituals, the arts, life-long learning and social justice." Labshul, About, http://labshul.org/about-labshul (last visited Apr. 18, 2017). Following the death of his mother, Mr. Hurant collaborated with Lab/Shul's Rabbi, Amichai Lau-Lavie, to form the "Kaddish Club," a bereavement support group. As Rabbi Lau-Lavie describes, "Mr. Hurant was a loyal regular during the entire duration of the year following his mother's passing, per Jewish custom, and often hosted in his home." Exhibit A (Letter of Amichai Lau-Lavie). Mr. Hurant "continues to show up for others dealing with grief, sharing his own experience and enabling others to better cope with life's challenges and be comforted following the deaths of loved ones." *Id.* Several members of Mr. Hurant's congregation have written to apprise the Court of Mr. Hurant's pivotal role in the community. *See id.* (Letters of Shira Kline and Naomi Less). These personal characteristics lend further support to a lenient sentence below the Guidelines. *See United States v. Green*, No. 04 CR. 424-13(RWS), 2005 WL 1423255, at *5-6 (S.D.N.Y. Jun. 15, 2005) (imposing below-Guidelines sentence where defendant "has reconnected with his spiritual faith . . . , involving himself in regular religious meetings and leading discussion groups" and "has reached out to his former church," which would provide support network).

Mr. Hurant's longstanding commitment to, and leadership in, the LGBTQ community is well-documented in the letters, including a letter of support from five members of the New York City Council noting the "far-reaching implications of this case for the LGBT community." Exhibit A (Letter of Councilman Daniel Dromm, *et al.*); *see also id.* (Letter of Allen Roskoff) ("Jeffrey Hurant has played a prominent role in the civil rights community. He has been instrumental in securing the rights and respect for members of the LGBT community, has been helpful in various organizations fighting to end discrimination based on gender, race and sexual orientation."); *id.* (Letter of Morgan Sommer) ("[H]e has been a champion of LGBT rights and at the forefront of our community action on civil unions, marriage rights, adoption rights and a host of other important issues. . . . He has been and always will be an asset to the LGBT community.").

Finally, this arrest is Mr. Hurant's first offense and he has otherwise lived a law-abiding life, run a lawful and successful computer consulting business, and has generally been a productive and contributing member of society, both as an entrepreneur and as a devoted friend to many. Mr. Hurant has been creating jobs, fostering community, and supporting those near to him – both family and friends – for many years. Courts frequently consider a defendant's law-abiding conduct and absence of prior criminal history as factors in imposing below-Guidelines sentences. *See United States v. Fernandez*, No. 12-cr-844 (RWS) (S.D.N.Y. Apr. 6, 2015) (imposing below-Guidelines sentence where "Defendant has no history of criminal activity and the instant offense constitutes both his first arrest and first conviction"); *United States v. Collado*, No. 01-cr-1103-02 (RWS), 2006 WL 2872593, at *3 (S.D.N.Y. Oct. 10, 2006) (imposing sentence of probation where defendant "has no prior criminal convictions and appears to have

otherwise been law-abiding").  Mr. Hurant's personal characteristics and history warrant a below-Guidelines, non-incarceratory sentence.

### C.   A Guidelines Sentence is Not Necessary to Achieve the Purposes of Sentencing

As mentioned above, section 3553(a) identifies several purposes of sentencing, including (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) deterrence and protection of the public from further crimes of the defendant; and (3) to provide the defendant with, among other things, vocational training and medical care.  These purposes of sentencing all weigh in favor of a non-incarceratory sentence.

First, a Guidelines sentence is not necessary to promote respect for the law, reflect the seriousness of the offense, or provide just punishment.  Mr. Hurant was at all times concerned with the lawfulness of his business, and he hired numerous attorneys to advise him on how to operate the business lawfully.  Indeed, this case presents a rare circumstance in which the defendant obtained legal advice on *whether the charged conduct is, in fact, a crime*.  Mr. Hurant sought such advice, and the answer he received was that he could run a website like Rentboy.com lawfully, by monitoring the content and prohibiting explicit offers of sex for money.  While such advice was questionable – and, as Mr. Hurant realizes with the benefit of hindsight, wrong – soliciting such advice is inconsistent with an offense that is committed without regard to or in defiance of the law.

It is not as if Mr. Hurant sought a "fig leaf" opinion from a crackpot lawyer that he knew would bless whatever scheme he presented:  the original 1997 memo specifically states that it is not "a watertight solution," Exhibit B, at 6, but provides a detailed analysis that a non-lawyer would have no reason to doubt.  Moreover, Mr. Hurant did not stop with the 1997 memo; he engaged lawyers to review and re-review Rentboy's website and policies, and to advise him on

how to operate the business so as to avoid prosecution. Mr. Hurant's solicitation of such advice in good faith indicates that the nature and circumstances of the offense are uniquely mitigating in this case. Indeed, had Mr. Hurant received different advice at that outset – or at *any time* during Rentboy's existence – he would not have run the business he did. *See* Exhibit A (Letter of Leslie Hurant) (noting that Mr. Hurant assured his parents, who expressed concern about the legality of Rentboy, that he had consulted with an attorney and determined a lawful way to run the business).

Consistent with legal advice Mr. Hurant received, he ran Rentboy.com openly and transparently. The company was well-known in the gay community, advertised their service widely, and cooperated with law enforcement investigations. This case is distinguishable from most federal criminal cases, in that the offense conduct was not concealed or conducted in a clandestine manner meant to avoid detection. Instead, as David Katz, an attorney who did legal work for the company states, Rentboy operated as "an open book." Exhibit A (Letter of David Katz). While Rentboy.com's transparency may have been misguided, it indicates a lower level of culpability than crimes committed in secret, with the goal of avoiding detection.

For these reasons – and the reasons described above concerning Mr. Hurant's dedication to providing services for advertising escorts – we submit that while promoting prostitution is clearly a serious crime, the manner in which Mr. Hurant conducted his business substantially mitigates the seriousness of the offense. Further, a sentence that includes supervision, combined with the devastating collateral consequences of a felony conviction, provides just punishment for the offense. *See Untied States v. Nesbeth*, 188 F. Supp. 3d 179, 187, 195 (E.D.N.Y. 2016) (considering collateral consequences as part of "just punishment" analysis under § 3553(a) and

determining that, taking such collateral consequences into account, sentence of one-year term of probation was warranted).

Second, a sentence of incarceration is not necessary to achieve general or specific deterrence. Extensive media coverage of Mr. Hurant's public arrest, the seizure of his assets, and of his guilty plea, *see, e.g.*, Alan Feuer, *C.E.O. of Male-Escort Site Pleads Guilty to Promoting Prostitution*, N.Y. Times, at A17 (Oct. 7, 2016), has put the public on notice that Rentboy's operations were unlawful and that prosecution and punishment is a certain consequence of promoting prostitution on the Internet. *See* U.S. Dep't of Justice, Nat'l Institute of Justice, *Five Things About Deterrence*, https://www.nij.gov/five-things/pages/deterrence.aspx#addenda (last visited Mar. 12, 2017) ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment."). General deterrence has been achieved.

As to specific deterrence, Mr. Hurant will never again violate the law, let alone operate a business like Rentboy. His total absence of criminal history strongly indicates that he will not reoffend. *See United States v. Cosme*, No. 06-cr-608 (JBW), 2010 WL 276599, at *2 (E.D.N.Y. Jan. 19, 2010) ("Specific deterrence is satisfied because it is improbable that [defendant] will engage in further criminal activity in light of his lack of any prior criminal history, acceptance of responsibility, . . . good conduct under supervised release, and supportive family members."); *accord* United States Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* 7-8 (2017) (noting that, generally, the lower individual's criminal history score, the lower his likelihood of recidivism, and that, among offenders with zero criminal history points, "offenders who had no prior contact with the criminal justice system

had a rearrest rate 11.7 percentage points lower than offenders with prior contact (25.7%
compared to 37.4%)").

Mr. Hurant's advanced age relative to other first-time defendants in the criminal justice
system also strongly indicates a decreased risk of recidivism.  *See United States v. Brudi*, 536 F.
App'x 131, 132 (2d Cir. 2013) (noting that a "clean record [and] advanced age militate[ ] against
a lengthy period of incarceration"); Jeremy Travis et al., Nat'l Research Council, *Incarceration
in the United States: Exploring Causes and Consequences* 131 (2014) ("Because recidivism rates
decline markedly with age, lengthy prison sentences, . . . are an inefficient approach to
preventing crime by incapacitation.").

Finally, a non-incarceratory sentence will provide Mr. Hurant with the medical care he
needs and will promote his continued lawful employment, providing the best opportunity for him
to successfully rebuild his life.  As to medical care, ███████████████████

With respect to Mr. Hurant's employment, he has been working hard to maintain lawful employment following his arrest, and has been hired to build a CRM platform for LaundryLux, a major North American supplier of commercial laundry equipment. *See* Exhibit A (Letters of Neil Milch and Cody Milch). As described in the letter of Mr. Hurant's direct supervisor, Cody Milch, the company would like to hire Mr. Hurant as Chief Technology Officer. *See id.* (Letter of Cody Milch). The company is aware of his legal situation, but nevertheless is hopeful that Mr. Hurant will be able to continue to work, both out of concern for Mr. Hurant and because of its economic interest in the uninterrupted advancement of its technology platform, which Mr. Hurant is facilitating. *Id.* Courts have found that successful efforts to maintain meaningful, legitimate employment indicate rehabilitation and are grounds for imposing below-Guidelines sentences. *See United States v. Hawkins*, 380 F. Supp. 2d 143, 175 (E.D.N.Y. 2005). To remove Mr. Hurant from his lawful, productive endeavors would exact an economic toll on society and serve little purpose.

In combination, the § 3553(a) factors support the conclusion that a non-incarceratory sentence in this case would be sufficient but not greater than necessary to achieve the purposes of sentencing. *See United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming, on appeal by the government, imposition of sentence of probation and home detention where defendant's "civic, charitable, and public service" combined with serious medical condition "combine to create a situation that differs significantly from the heartland cases covered by the guidelines" (internal quotation marks omitted)).

## III. As Easy Rent Systems Has Been Put Out of Business, No Further Sanction Is Necessary for the Corporate Entity

The parties agreed in the plea agreement that, with respect to the corporate entity, Easy Rent Systems, the appropriate sanction would be a fine sufficient to divest the corporation of its

assets.  All of the assets of Easy Rent Systems have been seized and forfeited to the government, the company's sole method of generating assets – operating Rentboy.com – has also been forfeited, and the company is out of business and effectively out of existence.  A probationary sentence as to Easy Rent is not necessary, because the business has ceased operations and has forfeited all of its assets.  Accordingly, we submit that no further sanction is necessary to achieve the purposes of sentencing with respect to the corporate entity.

## CONCLUSION

For the reasons detailed above, we respectfully submit that, in light of the applicable Guidelines and the factors set forth in § 3553(a), a non-incarceratory sentence is sufficient but not greater than necessary to serve the purposes of sentencing for Jeffrey Hurant and no further sanction is necessary for Easy Rent Systems, Inc.


Dated: New York, New York
       April 28, 2017

                              SHER TREMONTE LLP


                              By:   /s/ Michael Tremonte
                                    Michael Tremonte
                                    Noam Biale
                                    90 Broad Street, 23rd Floor
                                    New York, NY 10004
                                    (212) 202-2600
                                    mtremonte@shertremonte.com

                                    *Attorneys for Jeffrey Hurant*
                                    *and Easy Rent Systems, Inc.*