

U.S. Department of Justice

United States Attorney
Eastern District of New York

GMP:TJS
F. #2015R01982

271 Cadman Plaza East
Brooklyn, New York 11201

July 16, 2017

By ECF and Courtesy Copy by Interoffice Mail

The Honorable Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:   United States v. Easy Rent Systems, Inc. and Jeffrey Hurant
                Criminal Docket No. 16-045 (MKB)

Dear Judge Brodie:

      The government submits this letter in connection with sentencing currently set for July 21, 2017. For the reasons set forth below, the government respectfully requests a custodial sentence for Jeffrey Hurant.[1]

I.     Background

      Jeffrey Hurant was the chief executive officer of Easy Rent Systems, Inc. the business entity that owned and controlled Rentboy.com, a commercial male escort advertising internet site founded in 1997. (Jeffrey Hurant Pre-Sentence Investigation Report PSR ¶¶ 5, 7, 23.) It advertised itself to be "the original and largest male escort service online." (Id.) Escorts paid fees to advertise sexual services on the site. (Id.) Customers then contacted the escorts directly to arrange meetings. (Id.)

      There were several thousand advertisements on Rentboy.com. Rentboy.com advertised that it received approximately 500,000 unique visitors each day, about 70 percent of whom accessed the site from the United States. (PSR ¶ 6.) Rentboy.com made money by charging up to $299.95 for an advertisement on the site. (PSR ¶ 11.) Between just 2010 and 2015, the site had gross proceeds of over $10 million. (PSR ¶ 6.)

---

[1] The government agrees that Easy Rent Systems, Inc. has been divested of its assets no further sanction is necessary.

The Rentboy.com website had disclaimers that claimed that the advertisements on the site were for companionship only and not prostitution, but the site was primarily designed to advertise prostitution. (PSR ¶ 8.) The advertisements a user could create were not free-form, but rather had different specific categories for users to complete, including "Foreskin," "Cock Size," "Safe Sex," and "Sexual Position." (PSR ¶ 9.) The site also had required fields for "Escort's In Rate," "Escort's Out Rate," "Escort's Overnight Rate," and "Escort's Weekend Rate."[2] (PSR ¶ 10.) The rates were generally listed in United States Dollars per hour. (Id.)

Rentboy.com included a disclaimer that "offers of sexual conduct in exchange for money" and "explicit sexual conduct expected as part of your time" could not be included in advertisements. (PSR ¶ 12.) However, escorts frequently submitted advertisements that explicitly offered sexual services in exchange for money. (PSR ¶ 13.) Rentboy.com employees, who reviewed every ad and all changes to ads, would generally reject this language, but allow the ad to be resubmitted with different language. (PSR ¶¶ 12-14.) In many cases, Rentboy.com employees would just edit the advertisement's language and approve it. (PSR ¶ 14.) Rentboy.com employees sometimes cautioned escorts that explicit prostitution references would "get [the escort] into trouble with the law" and removing them was "for [the escort's] own safety." (PSR ¶ 15.)

Rentboy.com also operated a yearly awards show for the "International Escort Awards," which it referred to as "the Hookies." It advertised the show as "recognizing 17 categories covering all aspects of the oldest profession as presented in the newest media." During the course of the show, escorts who advertised on Rentboy.com received awards in a variety of sexually explicit categories.

On August 18, 2015, the Honorable Viktor V. Pohorelsky signed an arrest warrant authorizing the arrest of Hurant and several other Rentboy.com employees and the search of several locations based on probable cause set forth in a Complaint and Affidavit.[3] On August 25, 2015, Hurant was arrested at his home in New York. At the same time, agents conducted a search of several premises associated with Rentboy.com and seized the internet domain "Rentboy.com." On January 27, 2016, the Grand Jury returned an indictment charging Hurant and Easy Rent Systems, Inc. with Promotion of Prostitution, in

---

[2] "In Rate," "Out Rate," "Overnight Rate," and "Weekend Rate" are all terms used to explain the prices for different types of meetings with prostitutes. (PSR ¶ 10.)

[3] The defendants note that the complaint was criticized for "describ[ing] in salacious terms various sexual positions and sex toys" in Rentboy.com escort advertisements. As the Court knows, it was the government's obligation in the complaint to present evidence that established a probable cause to believe that Hurant and other Rentboy.com employees were well aware that Rentboy.com escorts were, in fact, offering illegal prostitution services despite the website's disclaimers to the contrary. Such terminology is evidence of the defendant's unmistakable knowledge.

violation of 18 U.S.C. § 1952(a)(3)(A), and Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h). On October 7, 2016, Hurant pled guilty to promoting prostitution. On the same day, Easy Rent Systems, Inc. pled guilty to conspiring to launder money.

II.     Guidelines Calculation

The government agrees with the Probation Department's amended Guidelines range of imprisonment of 18 to 24 months for Jeffrey Hurant. This range is the result of the following Guidelines calculation:

| | | |
|---|---|---:|
| | Base Offense Level (§§ 2E1.2(a)(2) and 2G1.1(a)(2)) | 14 |
| Plus: | Defendant was leader or organizer (§ 3B1.1(a)) | +4 |
| Less: | Acceptance of responsibility (§ 3E1.1) | -3 |
| Total: | | 15 |

As noted, the total offense level of 15 results in a Guidelines range of imprisonment of 18 to 24 months given the defendant's Criminal History Category of I.

In the plea agreement, the government agreed to seek a one-level reduction based on the case being disposed of as to both defendants simultaneously. As a result, the total offense level should be 14 and the Guidelines range of imprisonment should be 15 to 21 months.

Hurant objects to the base offense level used in this Guidelines calculation. U.S.S.G. Section 2E1.2(a)(2) provides that, for violations of 18 U.S.C. § 1952, the Guidelines base offense level is "the offense level applicable to the underlying . . . unlawful activity to which the travel or transportation was undertaken." Pursuant to § 2E1.2(a)(2) Application Note 2, if the "underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used. The state crime underlying the defendant's conduct is Promotion of Prostitution in the Third Degree, a felony under state law that criminalizes profiting from owning a prostitution business. The government agrees with the Probation Department that the most analogous federal offense is the Mann Act, 18 U.S.C. § 2421, a felony offense which criminalizes the transportation of an individual across state lines for the purposes of engaging in prostitution. Guidelines Section 2G1.1 (which is entitled "Promoting a Commercial Sex Act or Prohibited Sexual Conduct with an Individual Other than a Minor") is applicable to violations of § 2421.

Hurant argues that the Court should find that the closest analogous offense is 18 U.S.C. § 1384, a misdemeanor offense which criminalizes engaging in prostitution near a military facility. The defendant argues that the salient difference is between the transportation of prostitutes and the facilitation of prostitution. The Court should reject this analysis.

While the Second Circuit has not yet confronted the appropriate Guidelines calculation for a prostitution offense prosecuted under 18 U.S.C. § 1952, the Fifth Circuit's decision in United States v. Langley, 919 F.2d 926 (1990) addressed this exact question. In that decision, the Court held that under the Guidelines the Mann Act was the most analogous federal crime to a state felony prostitution charge. The Court rejected Langley's argument that because there was "no evidence that Langley transported prostitutes" he could not "be sentenced under the guideline for section 2421." Id. at 930. The Fifth Circuit reasoned:

> The commentary to sentencing guideline section 2E1.2 directs the sentencing court to select the federal offense most analogous to the state offense violated by the underlying unlawful activity. There exists no requirement that the defendant have been punishable under the most analogous federal offense in order for it to be properly deemed "most analogous." Numerous sections of the sentencing guidelines direct the court to apply the offense level of the federal offense most "analogous" to a particular unlawful activity; it would be unreasonable to read into every one of these sections the requirement that, in order to apply the analogous offense guideline, the sentencing court must effectively retry the defendant for an otherwise unrelated offense. "[A]nalogy does not mean identity. It implies difference." Sturm v. Ulrich, 10 F.2d 9, 11 (8th Cir.1925). Recognition of this aspect of the common understanding of "analogous" is at least appropriate when applying a sentencing guidelines directive that state offenses be analogized to federal ones, as the Sentencing Commission obviously was aware that almost all federal offenses have special federalizing elements which would be absent from nearly all state offenses. Thus, that the state offense lacks the federalizing element of a given federal offense should not of itself necessarily prevent the two from being considered "analogous" for purposes of such a guidelines directive. This seems particularly so in respect to guidelines for the Travel Act and state prostitution offenses, as the latter are an express target of the former.

Id. at 930-31. The Fifth Circuit also specifically rejected Langley's claim that Section 1384 was a more analogous offense. The Court noted that "violation of section 1384 differs significantly from section 2421 in that violation of the former constitutes a misdemeanor and violation of the latter a felony" and stated that "[i]t would be inappropriate to sentence Langley for violating an analogous misdemeanor offense where a more analogous felony offense exists, particularly in light of Congress' instruction that sentences imposed under the sentencing guidelines "reflect the seriousness of the offense." Id. at 932.

The Fifth Circuit's reasoning applies with equal force in this case. Like in Langley, the defendant was charged with a Travel Act violation involving the use of "a

4

facility in interstate commerce involv[ing the] promotion of prostitution" which violated state laws. Id. at 929. And, like in Langley, the state felony at issue was one which "require[d] in essence management or control of an ongoing, multi-person prostitution enterprise."[4] This Court should adopt the reasoning of the Fifth Circuit and apply Guideline 2G1.1—the Guideline section applicable to the Mann Act—to determine the appropriate Guidelines range of imprisonment for Hurant.

III.  Sentencing

    A.  Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 543 U.S. 220, 258-60 (2005). However, the Supreme Court held in Booker that sentencing courts must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

    B.  Sentencing Discussion

        1. Rentboy.com's Business

The defendant unambiguously operated one of the largest prostitution enterprises ever prosecuted. Rentboy.com hosted thousands of advertisements and operated

---

[4] In relevant part, New York Penal Law Section 230.25 identifies that "A person is guilty of promoting prostitution in the third degree when he or she knowingly advances or profits from prostitution by managing, supervising, controlling or owning, either alone or in association with others, a house of prostitution or a prostitution business or enterprise involving prostitution activity by two or more persons in prostitution." Importantly, a person who simply engages in prostitution or advances or profits from prostitution not involving their management of a prostitution business involving two or more persons is guilty only of a misdemeanor. See New York Penal Law Sections 230.00; 230.25.

5

for almost two decades. It likely facilitated hundreds of thousands of acts of prostitution across the United States.

The defendant's motivation to start Rentboy.com in order to facilitate prostitution is clear. As indicated in the defendant's sentencing submission ("Def. Ltr."), Hurant "had friends from college who earned extra money as escorts" and "had the simple idea to put their ads online" but he "was well aware . . . that the escorts' ads he posted . . . were thinly-veiled proposals of sexual services in exchange for money." (Def. Ltr. at 5.)

Hurant attempts to downplay Rentboy.com's criminality on two grounds. First, that he sought legal advice in connection with Rentboy.com. Second, that he believed Rentboy.com facilitated a social good. The Court should give neither excuse significant credence.

While it is undoubtedly true that Hurant sought and received legal advice in 1997, that advice does not indicate that Rentboy.com was lawful. The brief legal opinion noted that "there are clearly laws against prostitution and its promotion." (Def. Ltr. Ex. B at 3.) It also identified, as Hurant had, that listings abounded in print publications, like the Village Voice, for escort services. That advice stated that "they seem to be able to skirt the prostitution laws and everyone looks the other way." (Id.) While the advice suggested that this was because the ads were "cleverly drawn so as to be protected," it provided no reasoning for why that would be or how Hurant would be able to acquire that same protection for the ads he would post. Instead, it suggested that the Village Voice was protected not because it was engaged in legal activity, but rather because "it is hard to prove that the Voice knows exactly what their advertisers are selling." (Id.) The opinion vaguely concluded: "You cannot advertise your service blatantly as prostitution, but it likely that there will not be a problem if you stick to the vagueness of an escort/massage service." (Id. at 4.)[5] The defense submission candidly admits Hurant's understanding was not that Rentboy.com was operating legally, but rather that either escort ads were lawful or simply "that the chances of prosecution were vanishingly small," simply because the illicit activity was hard to prove. (Id.)

Hurant also points to his engagement with other lawyers during the course of Rentboy.com's business. Hurant says that "the law firm confirmed that there were risks to operating Rentboy.com, but never advised Mr. Hurant that the site was illegal." (Def. Ltr. at 7.) However, Hurant admits that they never "opined on the legality of the business *per se*." Hurant also fails to provide the Court with any of the opinions that the law firm did provide or the information Hurant provided to the law firm to reach its conclusions.

---

[5] Notably, Hurant did not even follow the opinion he received, which advised to "ensure all material from advertisers is screened for . . . prices." (Id. at 5.) Rentboy.com not only allowed advertisers to post prices, but had pre-programmed fill-in boxes for the prices for different types of meetings (in-call, out-call, overnight, weekend).

Hurant also identifies that in 2015 he hired additional lawyers to review Rentboy.com. According to Hurant, the lawyers advised that "in the event of a criminal prosecution, he would likely be protected by the First Amendment." (Def. Ltr. footnote 6.) Again, Hurant fails to provide the full context of this advice or the information that the attorneys relied on in reaching it. He does point to an article written by one of the attorneys, Lawrence Walters, which he says provides that same theory. Lawrence G. Walters, *Shooting the Messenger: An Analysis of Theories of Criminal Liability Used Against Adult-Themed Online Service Providers*, 23 Stan. L. & Pol'y Rev. 171, 194 (2012), attached as Exhibit A. As Hurant notes, that article states that "Basic free speech principles would appear to automatically prevent the imposition of criminal liability on escort classified sites based solely on their customers' content--particularly if the ads themselves did not explicitly offer, or imply, sexual activity for hire." Id. at 194. But that conclusion is inapplicable to Rentboy.com, which both allowed advertisements that implied sexual activity for hire, edited escorts' advertisements, and allowed links to customer review sites with explicit descriptions of sexual services that the escorts provided for payment. There is also no indication that the same opinion would adhere where, like Rentboy.com, the site operators were actually aware that its users were engaging in prostitution. In short, the thrust of all of Hurant's legal advice was the same. If you obfuscate the website's true purpose as a prostitution clearing house, prosecution is unlikely.

Hurant also defends Rentboy.com for "promot[ing] a human connection and a sex-positive message." (Def. Ltr. at 6.) He says that it "facilitated escorts' control over their work" and "separation from escort agencies and pimps." (Id.) However, for whatever social good Hurant claims Rentboy.com accomplished in promoting illegal prostitution, it is important to remember that it was not a selfless endeavor. It charged escorts between $59.95 and $299.95 per month for their ads. It had substantial gross receipts and was still growing. Rentboy.com was expanding to additional locations around the globe when it was shut down. Hurant also pocketed over $300,000 a year from the site according to the defense. Sales were a priority for Hurant. One Rentboy.com employee noted in a 2014 email "[Hurant] asked me last night before I left if thought the sales meetings were helpful. I told him they were helpful if his goal was to stress me out but otherwise, it can easily become overkill to bash us repeatedly for more sales." (March 6, 2014 email at 1, attached as Exhibit B.)

While Hurant says Rentboy.com drove exploitive pimps and escort agencies out of business, Rentboy.com had no problem with dealing with pimps. It continued to deal with pimps and escort agencies until it was closed. In one 2014 email, a Rentboy.com employee stated: "This is acct belongs to Attila . . . who brings in 10-12 boys/year to pimp out here. You've met him."[6] (July 11, 2014 email, attached as Exhibit C). In a 2015 email, a Rentboy.com employee asked his supervisors for a discount for "a premier escort agencies" who "buys in bulk." (June 19, 2015 email at 5, attached as Exhibit D.) In 2008, at Hurant's direction, Rentboy.com began offering a 15% discounts to holders with multiple ads. The

---

[6] While the employee used the term "boys," the government believes she was using it colloquially and not referring to minors.

defendant argues this discount was used by individual escorts, but fails to note that it was specifically created to incentivize agencies, hence the discount's code in the Rentboy.com system: "AGENCY15."  (See September 3, 2008 email, attached as Exhibit E.)

Hurant's sentencing submission also minimizes the significant risks that Rentboy.com created; risks that its own employees recognized when it offered advertisements for free in Asia.  On October 3, 2006, shortly after the company expanded to Asia, one Rentboy.com employee wrote to Hurant an email titled "ASIA MARKET IS OUT OF CONTROL." (October 3, 2006 email, attached as Exhibit F.)   In that email he stated that "the real issue is that all these boys look 'very young.'!!! We have to do something about these markets."  The employee suggested that Rentboy.com start paid ads in Asia and "verify billing and age in writing ALWAYS."  He also indicated that he was concerned about the "child-black market trade."  The government has not identified any response by Hurant to that email.  Nor did the government identify any evidence that Rentboy.com attempted to implement rigorous age verification requirements.  As of 2012, Rentboy.com still offered free ads in Asia and Rentboy.com employees still sent emails commenting about the number of "underage pics" in that market.  (See  January 27, 2012 email, attached as Exhibit G.) While Rentboy.com had policies against the advertisement of minors on the site, Rentboy.com never required all advertisers to provide age verification.  Rather, according to one undated set of approval policies, Rentboy.com would require age verification only if a Rentboy.com employee was "unsure about an escort's age." (Approval policy, attached as Exhibit H.)  Notably, age verification was not addressed at all in that policy's directions regarding new account openings, which primarily dealt with billing verification.  Rather, it appeared on page 4 of the policy, which dealt with the review of images escorts' sought to include on existing advertisements.  In total, the policy read "All our advertisers check a box online saying they are over 18 years old, but IF YOU ARE UNSURE ABOUT AN ESCORT'S AGE, call or email him and ask for a fax or scan of his DRIVERS LICENSE or PASSPORT, so we have something on file to show he is of legal age."  (Id.)  It is impossible to identify or quantify whether Rentboy.com's policies allowed minors located in Asia or elsewhere to be advertised on the site, but they certainly created that risk and did little to mitigate it.

The Court should not view Rentboy.com differently from prostitution enterprises who utilized female prostitutes.  As a starting point, the Court should consider that defendants in this district who operated relatively small-scale prostitution enterprises that also purported to be legal escort services have received sentences of incarceration.  For example, in United States v. Michael Rizzi, Judge Amon sentenced the operator of BJM Consulting d/b/a Manhattan Stakes and Entertainment to 15 months' imprisonment.  16-CR-487 (CBA).  That defendant ran an operation local to New York City that involved dozens of prostitutes over the course of approximately four years.  In United States v. Marc Schulman, Judge Korman sentenced the defendant to 1 year and 1 day imprisonment.  14 CR 415 (ERK).  That defendant ran a predecessor operation to the Rizzi prostitution enterprise, which involved at least 15 prostitutes and operated for over three years.

8

2. <u>Hurant's Mitigation Claims</u>

Hurant makes a number of mitigation claims based on the circumstances of this case and his public works. First, he argues that his lack of self-aggrandizement and greed should be mitigating factors. (Def. Ltr. at 25.) While both may be mitigating factors in certain cases, neither is applicable here. Through Rentboy.com, Hurant launched himself to a position of prominence in the LGBTQ community that he would otherwise not have achieved. He was the regular subject of interviews and the host of a raucous yearly awards show. His role as Rentboy.com's CEO was anything but humble. There is also little evidence that his participation in Rentboy.com evinces the kind of lack of greed that would qualify for a downward departure. As the defense recognizes, Hurant made over $300,000 annually from Rentboy.com, a sum of money that any number of criminals would envy.

Hurant also suggests that his participation in religious activities should be a mitigating factor in connection with sentencing. In support of that proposition, Hurant cites <u>United States v. Green</u>, No. 04 CR 424-13(RWS), 2005 WL 1423255, at *5-6 (S.D.N.Y. Jun. 15, 2005), in which the Court cited the fact that the defendant "reconnected with his spiritual faith while in prison over the past year" in support of its lenient sentence. <u>Id.</u> However, in <u>Green</u> the defendant's religious conviction was evidence of the fact that he was a changed man. Here, while the defendant engaged in a religious awakening, it appears from the letters that were submitted on his behalf that his participation in a religious community predated this arrest and did little to prevent him from continuing his prostitution enterprise.[7]

3. <u>Sentencing Recommendation</u>

A sentence of incarceration is appropriate in this case for two main reasons. First, such a sentence would promote respect for the law and the seriousness of the offense. Contrary to Hurant's claims, he did not operate Rentboy.com openly with an intent to comply with the law—indeed he admitted as much in his plea—rather Rentboy.com was cloaked in a façade intended to frustrate law enforcement action. That façade began as soon as a user visited the site and encountered terms of use that explicitly prohibited prostitution—despite prostitution being the site's true purpose. The front extended throughout the site and its operation as employees constantly reviewed ads, not for accuracy, but to be sure they didn't reveal the true activity that Rentboy.com supported. That activity did not evince respect for the law as Hurant claims, it made a mockery of the law.

Second, there is a strong need for general deterrence. While the arrests in this case were covered by the press, that press has done nothing to deter the operators of prostitution websites. A search for escort advertisements on the internet turns up site after site that offer fare little different from Rentboy.com. Indeed, Rentboy.com's main competitor is still in operation. Without actual punishment in this case, the operators of

---

[7] Rabbi Lau-Levie's letter references his participation in the congregation since 2005. Shira Kline's letter states that "over the years" she became friends with Hurant at LabShul. Naomi Less states that she has known Hurant for four years as a part of a Jewish community.

9

those websites will likely conclude that in the unlikely event of their conviction, they can expect only a slap on the wrist; hardly the type of punishment that would dissuade someone from the significant money that can be obtained through this type of criminal activity.

IV. <u>Conclusion</u>

For the reasons set forth above, the government asks that the Court impose a custodial sentence on Jeffrey Hurant.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:   /s/ Tyler Smith
Tyler Smith
Assistant U.S. Attorney
(718) 254-6186

cc: Michael Tremonte, Esq. (by ECF)
    Clerk of the Court (MKB) (by ECF)